UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

**New Hampshire Ball Bearings, Inc.**

    v.

**GeoSierra Environmental, Inc. et al**

Case No. 20-cv-258-PB
Opinion No. 2021 DNH 137

**MEMORANDUM AND ORDER**

On February 18, 2020, New Hampshire Ball Bearings, Inc. ("NHBB") filed a complaint against Hull & Associates, Inc. ("Hull") and GeoSierra Environmental, Inc. ("GeoSierra") for breach of contract, negligent misrepresentation, negligence, violation of the New Hampshire Consumer Protection Act, and breach of warranty.  The complaint seeks to hold both defendants liable for design and installation errors associated with a permeable reactive barrier ("PRB") that GeoSierra installed in 2014 at a superfund site controlled by NHBB.

Defendants have challenged the complaint in summary judgment motions arguing that NHBB's claims are barred by the applicable statutes of limitations.  For reasons I discuss below, I grant defendants' motions with respect to NHBB's breach of warranty claim but otherwise deny the motions because a genuine dispute of material fact exists as to whether NHBB discovered its claims more than three years before it filed its complaint.

1

## I. BACKGROUND

### A. History of the Site

NHBB has operated a facility in the vicinity of what is now the South Well Superfund Site ("Site") since 1956. The Site is located on 250 acres of the Contoocook River Valley in Peterborough, New Hampshire. NHBB's use of chlorinated solvents at its facility resulted in the release of volatile organic compounds ("VOCs") into the groundwater beneath the facility.

In an attempt to address the groundwater contamination at the Site, the Environmental Protection Agency ("EPA") issued a Record of Decision ("ROD") in 1989 requiring that NHBB install source control remedies and manage the migration of contaminants. Starting in 1990, Hull, a project development and engineering company, began serving as a consultant for NHBB, assisting with project management, engineering, and hydrogeologic consulting for the Site.

Hull initially designed, oversaw installation, and monitored implementation of a "pump and treat" system that removed, treated, and then replaced contaminated groundwater at the Site. By 2006, however, the system was no longer functioning at "peak efficiency" due to the impact of biofouling.[1] The EPA urged NHBB to consider additional treatment

---

[1] "Biofouling is the undesirable accumulation of microorganisms, plants, algae, arthropods, or mollusks to a surface . . . when

2

technologies to address the contaminated groundwater and, from 2006 to 2009, Hull conducted a Focused Feasibility Study ("FFS") to explore new treatment technologies.  The FFS examined the feasibility of a PRB,[2] in addition to other treatment methods, and Hull concluded that PRB technology could adequately treat the groundwater within the EPA's mandated parameters.

**B. Installation of the PRB**

Upon publication of Hull's FFS, the EPA issued an Amended Record of Decision ("AROD") in April 2009, replacing its initial 1989 ROD.  The AROD recommended the use of several new treatment methods, including thermal treatment, bioremediation, and the installation of a PRB.  In response, Hull evaluated several PRB designs, including patented technology by GeoSierra, a company specializing in PRB installation.  NHBB hired GeoSierra on September 12, 2012, to produce a final design for their patented "Azimuth" PRB.  The Azimuth PRB was intended to reduce VOCs to

---

it is in contact with water for a period of time."  Kathleen D. Oppenheimer Berkey & Todd K. BenDor, A Comprehensive Solution to the Biofouling Problem for the Endangered Florida Manatee and Other Species, 42 Envtl. L. 415, 421 (2012).

[2] A PRB is a system intended to "chemically neutralize contaminants" found in groundwater.  Def. GeoSierra Mot. for Summ. J., Doc. No. 35-1 at 5.  In operation, a PRB is a permeable "underground wall" consisting of iron filings stretching "from bedrock to the top of the water table," allowing groundwater to flow through the iron filings and treating the contaminants in the groundwater as it passes through.  Doc. No. 35-1 at 1.

certain maximum contaminant levels ("MCLs") and to provide a long-term solution to groundwater protection at the Site.

Hull submitted the PRB's final design for EPA approval, which was granted on December 3, 2013.  NHBB then contracted with GeoSierra to construct the PRB as designed.  In November 2014, GeoSierra completed installation of the PRB.

**C. Efficacy of the PRB**

On March 15, 2015, Hull began quarterly monitoring of groundwater samples both upgradient and downgradient of the PRB to analyze VOC concentrations at the Site.  On December 15, 2015, Hull sent NHBB an email that discussed the groundwater samples from March, June, and September 2015.  The email noted that "we have more weirdness in some of our key downgradient wells, particularly the wells at depth along the centerline of the plume."  Def. GeoSierra Ex. 7, Doc. No. 35-9 at 2.  Hull continued, "At some point, we should share these data with GeoSierra.  I wanted to run this by you, particularly if future legal actions are pursued, I was unsure how we should handle the sharing."  Doc. No. 35-9 at 2.  Although the email did not specify the source of the "weirdness," the data itself shows that PCE and TCE concentrations at certain wells downgradient of the PRB were higher than they were at upgradient wells.[3]  This

---

[3] For example, data from December 2015 at upgradient well PRB-FR50 showed PCE concentrations of 230 micrograms per liter,

4

"weirdness" was later discussed by Hull in its May 2016 report to NHBB, where it stated that, while "the Total VOC concentrations fail to demonstrate a clear trend . . . many of the downgradient wells continue to exhibit PCE and TCE at concentrations greater than the MCLs and in some cases, VOC concentrations are higher in the downgradient wells compared to their upgradient counterpart[s]." Def. GeoSierra Ex. 12, Doc. No. 35-14 at 38.

In January and February 2016, Hull sent data about the Site's historical groundwater levels to GeoSierra and requested an analysis and response. On February 3, 2016, NHBB requested the latest quarterly test results of groundwater contaminants from Hull. Hull replied that "the PRB data is similar in magnitude as September." Def. GeoSierra Ex. 9, Doc. No. 35-11 at 2. Five days later, Hull reached out to GeoSierra for its "opinion [o]n what is happening (or not happening) as well as

---

whereas its downgradient counterpart well PRB-M50 showed PCE concentrations of 530 micrograms per liter. The same pattern was true at upgradient well PRB-GR50, which showed PCE concentrations of 24 micrograms per liter, with its downgradient counterpart well PRB-L50 showing 300 micrograms per liter. See Def. Hull Ex. 5, Doc. No. 34-6 at 65; Def. GeoSierra Ex. 12, Doc. No. 35-14 at 31. According to Hull's 2016 report, "The downgradient wells of these pairs showed an approximate 103% and 245% increase in PCE concentration over the duration of 2015 in the results from PRB-M50 and PRB-L50, respectively." Def. GeoSierra Ex. 12, Doc. No. 35-14 at 31.

your suggestions for corrective actions." Def. GeoSierra Ex. 10, Doc. No. 35-12 at 2.

GeoSierra responded on March 7, 2016 with an email providing its interpretation of the groundwater monitoring data. The email, which was initially provided to Hull and later shared with NHBB, concluded that "[t]here are and will continue to be many dynamics occurring at the site, which have and may contribute further to the elevated PCE concentrations measured along the PRB[.]" Def. GeoSierra Ex. 11, Doc. No. 35-13 at 4. One such "dynamic" was that existing extraction wells continued to operate while the PRB was under construction and for several months after construction had been completed. According to the email, "the existing extraction wells provided limited hydraulic containment during PRB installation, which flattened the gradient and possibly reversed or stalled the PCE treatment through the PRB." Doc. No. 35-13 at 4. The email also noted that "[t]he aquifer disruption from the installation of the NHBB PRB and then shut off of the extraction wells raised the water table a minimum of 1.5 feet and pushed PCE downgradient resulting in the elevated concentrations that are now measured in some of the wells." Doc. No. 35-13 at 4. The email concluded, "Because of the distance between the extraction wells and PRB wells, we would expect the concentrations to remain high for several more monitoring periods . . . ." Doc. No. 35-13 at

6

5. GeoSierra then advised NHBB that additional monitoring of both upgradient and downgradient wells was recommended to evaluate the PRB's performance. Hull agreed with GeoSierra's assessment.

On October 6, 2017, Hull published a Work Plan, stating that, based on the data and the location of the monitoring wells, it was unclear if the PRB was sufficiently treating the Site "as a result of reduced retention time resulting from the increase in hydraulic gradients near the PRB," if "back diffusion" was "affecting downgradient well concentrations," or if insufficient time had passed to "provide adequate pore water flushing between the wall and the downgradient monitoring network." Ex. I in Supp. Pl. Obj. to Mot. for Summ. J. ("Pl. Ex."), Doc. No. 39-11 at 4.

Monitoring results of VOC concentrations in the groundwater remained inconclusive during this period. In response, NHBB contracted with Hull to conduct a two-phase investigation of the PRB's performance, as required by the EPA. Phase I of the investigation was intended to evaluate VOC concentrations and geochemical conditions in the groundwater immediately upgradient and downgradient from the PRB. After Phase I was completed in March 2018, Hull concluded that "the results of routine quarterly performance monitoring of the PRB . . . [have] been inconclusive in demonstrating the efficacy of the barrier," and

7

the EPA requested additional investigation of the PRB.  Pl. Ex. H, Doc. No. 39-10 at 6; Pl. Ex. J, Doc. No. 39-12 at 10-11.

Hull conducted Phase II of the investigation from September to December 2018 to verify that the PRB was constructed in accordance with the approved design and to identify "the presence of any mineral or organic coating or other change in iron mineralogy at select location from the PRB."  Pl. Ex. J, Doc. No. 39-12 at 11.  Phase II concluded that the PRB was not constructed as designed, and that substantial flaws existed in the installation and thickness of the PRB which "plausibly explained" the "absence of expected reductions of VOC concentration in groundwater."  Pl. Ex. J, Doc. No. 39-12 at 32.

After Hull's Phase I investigation, NHBB retained Environmental Resources Management ("ERM"), an environmental consulting firm, "to assess the investigation, design, installation, and effectiveness of the . . . PRB installed at the Site."  Pl. Ex. D, Doc. No. 39-6 at 6.  ERM disclosed its conclusions to NHBB on March 5, 2019, identifying three significant issues with the design, installation, and performance of the PRB: (1) the PRB design was based on incorrect data; (2) the installation method resulted in non-uniform thickness of the PRB; and (3) "[a]s a result of being under-designed and improperly installed, the final PRB is not effectively reducing [VOC] concentrations in groundwater."  Pl.

8

Ex. D, Doc. No. 39-6 at 22-24.  On March 17, 2019, NHBB sent a letter to both Hull and GeoSierra asserting design and installation flaws in the PRB.  NHBB filed its complaint less than a year later, on February 18, 2020.

## II.   STANDARD OF REVIEW

Summary judgment is appropriate when the record reveals "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); Tang v. Citizens Bank, N.A., 821 F.3d 206, 215 (1st Cir. 2016).  In this context, a "material fact" is one that has the "potential to affect the outcome of the suit."  Cherkaoui v. City of Quincy, 877 F.3d 14, 23 (1st Cir. 2017) (cleaned up).  A "genuine dispute" exists if a jury could resolve the disputed fact in the nonmovant's favor.  Ellis v. Fidelity Mgmt. Trust Co., 883 F.3d 1, 7 (1st Cir. 2018).

The movant bears the initial burden of presenting evidence that "it believes demonstrates the absence of a genuine issue of material fact."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); accord Flovac, Inc. v. Airvac, Inc., 817 F.3d 849, 853 (1st Cir. 2016).  Once the movant has properly presented such evidence, the burden shifts to the nonmoving party to designate "specific facts showing that there is a genuine issue for trial," Celotex, 477 U.S. at 324, and to "demonstrate that a trier of fact could reasonably resolve that issue in its favor."

9

Flovac, 817 F.3d at 853 (cleaned up). If the nonmovant fails to adduce such evidence on which a reasonable factfinder could base a favorable verdict, the motion must be granted. See id. In considering the evidence presented by either party, all reasonable inferences are to be drawn in the nonmoving party's favor. See Theriault v. Genesis HealthCare LLC, 890 F.3d 342, 348 (1st Cir. 2018).

### III.  ANALYSIS

Hull and GeoSierra argue that NHBB's contract, negligent misrepresentation, negligence, and Consumer Protection Act claims are barred by the three-year statute of limitations that governs those claims. They also argue that NHBB's breach of warranty claim is barred by that claim's four-year statute of limitations. I begin by addressing defendants' statute of limitations arguments and end by assessing a separate challenge that GeoSierra has made to Hull's crossclaims for contribution and indemnity.

**A. Contract, Negligent Misrepresentation, Negligence, and Consumer Protection Act Claims**

The three-year statute of limitations that applies to most of NHBB's claims is subject to a "discovery" exception that tolls the statute until the plaintiff knew or reasonably should have known of its injury and the causal connection between the injury and the defendant's conduct. Kelleher v. Marvin Lumber &

Cedar Co., 152 N.H. 813, 824-25 (2005) (citing Big League Entm't v. Brox Indus., 149 N.H. 480, 485 (2003)).  The discovery rule is not intended to toll the limitations period until the full extent of the plaintiff's injury becomes known.  Furbush v. McKittrick, 149 N.H. 426, 431 (2003).  Rather, the rule tolls the limitations period until "the plaintiff could reasonably discern that he suffered some harm caused by the defendant's conduct."  Id.  The plaintiff "need not be certain of this causal connection; the possibility that it existed will suffice to obviate the protections of the discovery rule."  Beane v. Dana S. Beane & Co., P.C., 160 N.H. 708, 713 (2010).  Although the statute of limitations is an affirmative defense that the defendant must prove, the plaintiff has the burden of proving that an otherwise barred claim is saved by the discovery rule.  Lamprey v. Britton Constr., Inc., 163 N.H. 252, 257 (2012).

The parties agree that GeoSierra installed the allegedly defective PRB in 2014, well more than three years before NHBB filed its complaint.  The issue then is whether NHBB's claims are saved from the statute of limitations by the discovery rule.  Defendants argue that they are entitled to summary judgment on this issue because the undisputed evidence demonstrates that NHBB knew or reasonably should have known that it had been injured by the defendants at the latest in March 2016, when Hull informed it of GeoSierra's March 7 email.  I disagree.

11

The First Circuit was presented with a similar problem in Cambridge Plating Co. v. Napco, Inc. See 991 F.2d 21, 25-30 (1st Cir. 1993). In that case, a wastewater treatment system purchaser, Cambridge Plating Company, appealed the grant of summary judgment for the wastewater treatment system seller on statute of limitations grounds. Id. at 22. Cambridge Plating experienced unsatisfactory results from its wastewater treatment system a year after installation, and the seller suggested that system operations were the likely cause. Id. at 23. Cambridge Plating took steps to rectify operations issues, including replacing the system operators, implementing other changes suggested by the seller, and consulting with an independent expert who also recommended operational changes. Id. However, after the Massachusetts Water Resources Authority fined Cambridge Plating for regulatory violations, Cambridge Plating consulted with a second expert who concluded that design flaws, installation errors, and substandard engineering practices were responsible for the unsatisfactory results. Id.

The First Circuit concluded that Cambridge Plating had the correct interpretation of the Massachusetts discovery rule. As the court noted when reaching this conclusion: "The inquiry . . . must focus on the reasonableness of what the company actually did. If the company acted diligently, but still reasonably failed to learn of its cause of action, the discovery

12

rule would continue to delay the limitations clock." Id. at 26. The court concluded that "if Cambridge Plating acted reasonably diligently when it hired the first expert, the fact that that expert failed to discover the system's defects must be sufficient to toll the statute of limitations." Id.

Here, the record reveals that NHBB was aware as early as December 2015 that samples drawn from some of the wells downgradient of the PRB were showing concentrations of VOCs that were above MCLs and higher than their upgradient counterparts. What the company did not know, however, was whether the "weirdness" of these results was indicative of a problem with the PRB. To investigate the problem, NHBB turned to Hull, its longstanding consultant, and Hull asked GeoSierra for its views. GeoSierra's March 7 email responding to Hull's inquiries discussed the inconsistent results and speculated about several potential causes, including changing site conditions, the location of the monitoring wells, and contamination downgradient of the PRB. GeoSierra also provided recommendations:

> Because of the distance between the extraction wells and PRB wells, we would expect the concentrations to remain high for several more monitoring periods in both the upgradient PRB wells and hopefully to a lesser extent in the downgradient well. In order to further evaluate site conditions, continued quarterly groundwater sampling and groundwater geochemical and parameters is recommended.

13

Def. GeoSierra Ex. 11, Doc. No. 35-13 at 5.  Hull, NHBB's consultant, agreed with this recommendation.

It is important to bear in mind when considering the parties' arguments that none of GeoSierra's suggested causes of the "weirdness" in the groundwater sampling data involved the PRB's design or installation, and none of GeoSierra's recommendations involved changes to the PRB itself.  It is also apparent from the record that GeoSierra did not identify any of the issues NHBB raises in this lawsuit, namely that design and installation flaws in the PRB itself prevented it from operating as intended.

Despite this, the defendants argue that the report's inability to pinpoint a cause of the data's "weirdness" should have indicated to NHBB that a larger problem existed and that GeoSierra's recommendations, as the PRB's designer and installer, were untrustworthy.  However, as in Cambridge Plating Co., defendants' conclusions and recommendations appear "far less portentous," as neither Hull nor GeoSierra suggested that the testing results were indicative of a defect in the PRB and both defendants were recommending additional testing.  See 991 F.2d at 29.

When the problems persisted despite suggestions to continue monitoring, NHBB conducted a two-phase inquiry into the PRB in 2017 and, in September 2018, hired an independent consultant to

14

investigate potential issues. The gap in time between GeoSierra's March 2016 email and NHBB's 2017 decision to investigate the PRB would be troubling if it were not the direct result of GeoSierra's advice to wait and see if the data resolved on its own, and Hull's suggestion in a 2015 report that two years of monitoring would be necessary to understand the efficacy of the PRB. See Pl. Ex. F, Doc. No. 39-8 at 21 ("[L]ong-term monitoring of the PRB will be implemented on a quarterly basis for the first two years followed by semi-annual sampling.").

Although GeoSierra and Hull were not independent consultants, NHBB had worked with Hull since 1990, and with GeoSierra since 2012, and had relied on both companies throughout their contracts to provide accurate advice about the Site, treatment options, and the efficacy of the PRB. See Cambridge Plating Co., 991 F.2d at 30 (asking whether the first expert consulted was "competent to evaluate the system" and "[w]ould even a well qualified expert necessarily have uncovered the problem based on what he knew about the system at that point"). It was not unreasonable for NHBB to rely on their expert advice when it came to the question of the PRB's efficacy as they were the parties who understood the Site and this specific PRB the best.

15

The first indication that the PRB itself was responsible for the groundwater sampling results arguably occurred, at the earliest, in October 2017, when NHBB received Hull's 2017 report stating that one potential explanation for the inconsistent data was "insufficient treatment from the PRB."  Pl. Ex. I, Doc. No. 39-11 at 4.  Because NHBB filed its complaint within three years of this date, the evidence in the record is sufficient to permit a conclusion that the discovery rule saves NHBB's contract, negligent misrepresentation, negligence, and Consumer Protection Act claims.

### B. Implied Warranty Claim

The four-year statute of limitations that governs NHBB's breach of warranty claim states:

> A cause of action accrues when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach.  A breach of warranty occurs when tender of delivery is made, except that where a warranty explicitly extends to future performance of the goods and discovery of the breach must await the time of such performance the cause of action accrues when the breach is or should have been discovered.

N.H. Rev. Stat. Ann. § 382-A:2-725(2).

GeoSierra argues that NHBB's breach of warranty claim is barred by this statute because it completed installation of the PRB in 2014, more than four years before the present suit was

16

filed in 2020.[4]  NHBB counters that GeoSierra did not tender delivery of the PRB until the end of a two-year monitoring period required by the EPA.  Accordingly, NHBB argues that the statute of limitations on its breach of warranty claim did not begin to run until late 2016 when the two year monitoring period expired.  I am unpersuaded by NHBB's argument.

The parties agree that installation of the PRB was completed in 2014.  The complaint, however, makes no mention of a two-year monitoring period, nor does NHBB point to any term in its contract with GeoSierra in which a two-year monitoring period was agreed upon.  See Carll v. McClain Indus., Inc., 2001 DNH 113, 2001 WL 71612845, at *3 (D.N.H. June 12, 2001) ("Tender of delivery is normally determined by the delivery terms of the contract.").  Instead, NHBB points to a 2015 document entitled "Long Term Monitoring and Operations & Maintenance Plan," produced by Hull and approved by the EPA, which states that quarterly monitoring of the PRB will occur for two years.  See Pl. Ex. F, Doc. No. 39-8 at 2, 21.  NHBB, however, has not shown that delivery of the PRB was incomplete after GeoSierra installed it in 2014.  Nor has it identified any explicit or implicit warranty or service agreement between the parties that

---

[4] GeoSierra assumes that the PRB is a "good" as defined in New Hampshire's version of the Uniform Commercial Code.  I, too, make this assumption for purposes of analysis when evaluating GeoSierra's statute of limitations argument.

would extend this delivery period.  Further, NHBB has not pointed to any caselaw that supports its argument that a warranty or service agreement of this kind would shift the date of delivery to the end of that warranty or service agreement period even if such an agreement had been identified.

NHBB argues in the alternative that equitable tolling applies in this case because GeoSierra recommended additional monitoring to assess the PRB and it, therefore, engaged in a repair of the PRB upon which NHBB relied.  Again, I disagree. "[T]he First Circuit [has] concluded that equitable tolling is inapplicable to implied-warranty claims governed by RSA 382-A:2-725." Begley v. Windsor Surry Co., 2018 DNH 057, 2018 WL 140179695, at *8 (D.N.H. Mar. 19, 2018) (citing Lockheed Martin Corp. v. RFI Supply, Inc., 440 F.3d 549 (1st Cir. 2006)). Although the New Hampshire Supreme Court has yet to explicitly rule on this issue, "in light of the First Circuit's decision and the absence of any intervening state authority to the contrary, this court considers it appropriate to follow the 'Erie guess' of the First Circuit." Id. (citing Potomac Ins. Co. v. Woods, No. 1:95-cv-469, 1996 WL 450687, at *5 (E.D. Tex. July 22, 1996)); see also Norris v. Atrium Medical Corp., 2019 DNH 158, 2019 WL 4542727, at *2 (D.N.H. Sept. 12, 2019) (citing Begley, 2018 WL 1401796, at *8) ("[E]quitable tolling . . . do[es] not apply to breach of implied warranties claims.").

Because NHBB has failed to show that the PRB was in fact delivered within the applicable statute of limitations or that the limitations period may be equitably tolled, GeoSierra's motion for summary judgment as to NHBB's claim for breach of warranty is granted.

**C. Hull's Crossclaims for Contribution and Indemnity**

GeoSierra argues that Hull's crossclaims for indemnity and contribution cannot succeed because they are derivative of NHBB's claims and those claims are barred by the applicable statutes of limitations.  Because I have rejected defendants' arguments that most of NHBB's claims are time-barred, this argument is a nonstarter.

GeoSierra also argues that Hull's crossclaim for contribution is not ripe because NHBB has not yet succeeded on any of its claims against Hull.  "[A] pre-judgment claim for contribution remains premature until the contribution claimant has discharged the common liability." Hardie v. Crecco, 2014 DNH 061, 2014 WL 1248046, at *3 (D.N.H. Mar. 27, 2014).  The only exception to this rule is "if and only if the plaintiff in the principal action agrees," in which case "a defendant seeking contribution may bring an action in contribution prior to the resolution of the plaintiff's principal action, and such action shall be consolidated for all purposes with the principal action."  Patriot Ins. Co. v. Tri State Hood & Duct, LLC, 2019

19

DNH 196, 2019 WL 6174202, at *2 (D.N.H. Nov. 20, 2019) (quoting N.H. Rev. Stat. Ann. § 507:7-g(IV)(c)) (cleaned up).  Because NHBB has not agreed that such an action may be consolidated, Hull's crossclaim for contribution is not ripe and must be dismissed without prejudice.

## IV.    CONCLUSION

For the foregoing reasons, I deny defendants' motions for summary judgment with respect to NHBB's claims for breach of contract (Counts I and IV), negligent misrepresentation (Counts II and VII), negligence (Count V), and violations of the New Hampshire Consumer Protection Act (Count VI).  GeoSierra's motion for summary judgment with respect to NHBB's breach of warranty claim (Count III) is granted.  GeoSierra's challenge to Hull's crossclaim for indemnification is denied, but I dismiss Hull's crossclaim for contribution without prejudice.

SO ORDERED.

/s/ Paul J. Barbadoro
Paul J. Barbadoro
United States District Judge

August 27, 2021

cc:   Brian J. Bouchard, Esq.
      Robert R. Lucic, Esq.
      Barbara Brady, Esq.
      Jacquelyn Beatty, Esq.
      Laura L. Carroll, Esq.
      Robert Radcliffe, Esq.
      Cheryl A. Waterhouse, Esq.
      Jon C. Cowen, Esq.
      Michael E. Coghlan, Esq.